# United States Court of Appeals for the Federal Circuit

---

**BELDEN INC.,**
*Appellant*

v.

**BERK-TEK LLC,**
*Cross-Appellant*

---

2014-1575, -1576

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2013-00057.

---

Decided: November 5, 2015

---

MATTHEW B. LOWRIE, Foley & Lardner LLP, Boston, MA, argued for appellant. Also represented by MATTHEW AMBROS, AARON W. MOORE.

JAMES S. BLANK, Kaye Scholer LLP, New York, NY, argued for cross-appellant. Also represented by BENJAMIN C. HSING, DAVID SOOFIAN; GREGORY C. ANTRIM, JOSEPH SOFER, Sofer & Haroun, LLP, New York, NY.

FRANCES LYNCH, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for intervenor Michelle K. Lee. Also represented by NATHAN

K. Kelley, Thomas W. Krause, Robert J. McManus, Scott Weidenfeller.

—————————————

Before Newman, Dyk, and Taranto, *Circuit Judges.*

Taranto, *Circuit Judge.*

Belden Inc. owns U.S. Patent No. 6,074,503, which discloses and claims a method for making a communications cable. On a petition for inter partes review under 35 U.S.C. § 311 *et seq.* filed by the predecessor of Berk-Tek LLC, the Patent and Trademark Office's Patent Trial and Appeal Board instituted a review and later reached a mixed decision: it rejected claims 1–4 of the '503 patent for obviousness, while confirming claims 5 and 6. We now affirm the rejection of claims 1–4 and reverse the upholding of claims 5 and 6. We also reject Belden's contention that the Board denied it procedural rights in the review.

## Background

Belden and Berk-Tek compete in making and selling telecommunications cable and cabling systems. The '503 patent, issued on June 13, 2000, discloses a method of making a cable by passing a core and conducting wires through one or more dies, bunching the wires into grooves on the core, twisting the bunch to close the cable, and jacketing the entire assembly. These figures show an assembly described as containing three dies (**403**, **411**, **413**) and a cross-section of a resulting cable (**200**):



FIG. 4                          FIG. 2

The patent contained four claims when issued in 2000. Belden added claims 5 and 6 in 2010 in an ex parte reexamination. Claim 1 is the only independent claim:

1. A method of producing a cable, comprising steps of:

passing a plurality of transmission media and a core through a first die which aligns the plurality of transmission media with surface features of the core and prevents twisting motion of the core;

bunching the aligned plurality of transmission media and core using a second die which forces each of the plurality of transmission media into contact with the surface features of the core which maintain a spatial relationship between each of the plurality of transmission media;

twisting the bunched plurality of transmission media and core to close the cable; and

jacketing the closed cable.

'503 patent, col. 6, lines 4–17.

Belden groups claim 4 with claim 1 for analysis. Claim 4, dependent on claim 1, adds an "extrusion" requirement: during the passing step, "extruding the core so that the surface features thereof align with the plurality of transmission media." *Id.*, col. 6, lines 28–31.

Belden groups claims 2 and 3 for analysis. Claim 2 requires, "*before* passing the transmission media and the core through the *first die*, passing the transmission media and the core through *a third die* which generally centers the core relative to the plurality of transmission media." *Id.*, col. 6, lines 18–22 (emphases added). That is, claim 2 calls for the large die ("third") that is upstream of the small die ("first") shown in the left figure above—the "second" being the tube-shaped structure shown there. Claim 3, dependent on claim 2, claims for the third die what claim 4 claims for the first: it requires "extruding the core at a center position relative to the plurality of transmission media" when the core and media pass through the third die. *Id.*, col. 6, lines 23–27.

Belden groups claims 5 and 6 for analysis. Claim 5, dependent on claim 1, requires that the transmission media be "*twisted pairs of insulated conductors.*" '503 patent reexamination certificate, col. 2, lines 7–9 (emphasis added). Claim 6, dependent on claim 5, requires four such pairs. *Id.*, col. 2, lines 10–12.

On November 19, 2012, Berk-Tek's predecessor, Nexans, Inc., petitioned for inter partes review of all claims of the '503 patent under 35 U.S.C. § 311. The petition—actually, the corrected petition filed nine days later, making changes not material here—asserts anticipation and obviousness based on seven prior-art refer-

ences.[1] On April 16, 2013, the Board, as delegee of the PTO Director, instituted a review of all claims under § 314(a), finding a "reasonable likelihood" that the methods of all six claims were unpatentable. *Nexans, Inc. v. Belden Technologies Inc.*, IPR2013-57, 2013 WL 8595538 (PTAB Apr. 16, 2013).

The Board found likely obviousness of the methods of claims 1 and 4 based on Japanese Patent No. 19910 (JP '910). It found likely obviousness of the methods of claims 2 and 3 based on JP '910 together with either U.S. Patent No. 4,393,582 (US '582) or Japanese Patent No. 76694 (JP '694). And it found likely obviousness of the methods of claims 5 and 6 based on JP '910 together with Canadian Patent No. 2,058,046 (CA '046).[2]

The central reference, JP '910, describes a method of making a communication cable, illustrated below. The method entails extruding a core (thread-like object 1) through heated rollers (2a–2c) to form four grooves in the core, located at corners of a square when viewed in cross-section. The core and four conducting wires (4a–4d) are fed through a die (wire-splitting board 5), the wires placed

---

[1] The versions of 35 U.S.C. §§ 102 (anticipation) and 103 (obviousness) that apply here are those preceding the changes made by the America Invents Act, given the effective filing dates of the claims of the '503 patent. *See* Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284, 293 (2011).

[2] The Board also found likely anticipation of claims 1 and 2 by US '582, but in its final written decision, it rejected anticipation, so we do not elaborate on the initial likely-anticipation finding.

into the grooves on the core, and the assembly bunched, stranded, and jacketed to form a cable.[3]



FIG. 1 (JP '910)

FIG. 4 (JP '910)

JP '694 and US '582 also describe methods of making a cable or cable core, illustrated below. JP '694 teaches passing a group of wires and shielding tape through a first die (plate 31), then a second die (plate 32), and finally a set of shaping tubes that wrap the shielding tape around the wires. JP '694, col. 4, lines 7–28. US '582 similarly teaches making a cable core, in which a metallic tape and two groups of wires are fed through a first die (plate 67) and a second die (plate 71). '582 patent, col. 5, lines 1–33.

---

[3]    JP '910 describes "S-Z" stranding, which involves alternately twisting in one direction, then the other. The name reflects the difference in the resulting helices viewed from outside: "S" has a diagonal from northwest to southeast, "Z" from southwest to northeast.



FIG. 1 (JP '694)



FIG. 1 (US '582)

CA '046 describes a telecommunications cable containing twisted pairs of conducting wires, separated by a spacer to minimize cross talk. The patent illustrates different spacers separating four twisted pairs of wires. CA '046, col. 3, line 36 to col. 4, line 37.



FIG. 2 (CA '046)            FIG 3. (CA '046)

Among the Board's preliminary determinations in its Institution Decision are the following. (We discuss only

claims 1, 2, and 5, there being no separate arguments for claims 4, 3, and 6.) As to claim 1, the Board determined that "JP '910 articulates a special need to have the wires aligned at precise locations on the core during stranding after passing through wire-splitting board 5" and, based on that need, "one with ordinary skill in the art would have known that the passage of core 1 through wire-splitting board 5 preferably should be made such that twisting of the core causing misalignment of the wires would be prevented." *Nexans*, 2013 WL 8595538 at \*14. As to claim 2, the Board found that "each of [US] '582 and JP '694 discloses the concept of an additional die which centers, in a general manner, the core relative to the plurality of transmission media," *id.*, and that "[i]nserting an additional die upstream of wire-splitting board 5 of the assembly of JP '910 involves merely a predictable use of a prior art element disclosed in each of [US] '582 and JP '694, to achieve the same advantage[ou]s result." *Id.* at \*15. As to claim 5, the Board determined that CA '046 discloses that "a telecommunication cable is constructed normally with one or more core units each of which is conventionally a twisted pair of conductors," *id.* at \*17, and that, because "JP '910 is directed to a method of manufacturing insulated communication cables," a skilled artisan "would have understood that the method of JP '910 is applicable for use in manufacturing a telecommunications cable" and "would have known to apply the teaching in CA '046, about a conductor unit's being made conventionally of a twisted pair of conductors, to each conductor unit 4a, 4b, 4c, and 4d, in JP '910." *Id.* at \*18.

The review having been instituted, Belden submitted its Patent Owner Response on June 24, 2013, attaching a declaration from its expert, William T. Clark, who is a named inventor on the '503 patent and many other cabling patents. Berk-Tek submitted its Reply on August 26, 2013, attaching a declaration from its expert, Les

Baxter. Berk-Tek had attached no declaration to its Petition.

Belden orally opposed receipt of Mr. Baxter's declaration with the Reply, arguing that it had no opportunity to respond. On September 10, 2013, the Board noted that its regulations permitted Belden to cross-examine Mr. Baxter, *see* 37 C.F.R. § 42.51(b)(1)(ii), and that Belden could move to file non-argumentative observations (up to five pages) calling the Board's attention to relevant aspects of the cross-examination. The Board also "cautioned" Berk-Tek that, if its Reply "includes material it should have submitted together with its Petition, the Board may decline the entirety of the Reply," and the Board gave Belden "two days to consider whether to file a Revised Reply"—only to remove material, not add any. J.A. 876; *see* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) (Reply material is limited to responsive matter; whole Reply may be rejected if any part is improper).

On September 12, 2013, Berk-Tek submitted a revised Reply. On October 17, 2013, after taking Mr. Baxter's deposition, Belden filed a motion for observations on what Mr. Baxter had said. The same day, Belden moved to exclude Mr. Baxter's declaration and accompanying exhibits, arguing that portions of Mr. Baxter's declaration were not responsive to Mr. Clark's declaration and that Mr. Baxter's declaration contained arguments and evidence necessary for the prima facie case of obviousness. Berk-Tek opposed the motion, and Belden replied.

On the merits, Belden focused its argument as to claim 1 on the prevention-of-twisting element. It argued that JP '910 does not suggest configuring board 5 to prevent twisting, that board 5 would not have been able to grip the core in JP '910, at least not without producing friction that would have deformed the core, and that any tension placed on the core during the cable-making pro-

cess would already have been relieved in JP '910 by its (alternating-direction) stranding step. As to claim 2, Belden argued that JP '910 did not suggest adding a third die to its method, Berk-Tek had submitted no evidence showing a reason to combine the third die of US '582 or JP '694 with the JP '910 method, and that a skilled artisan would have viewed adding a third die to JP '910 as only increasing stress without any apparent benefit. As to claim 5, Belden argued that JP '910 teaches away from making a cable with individually insulated twisted pairs, particularly because using insulated conductors would render JP '910's jacketing step redundant and "would destroy the circular shape of JP '910's 'quad' wire." J.A. 586.

Berk-Tek, in its Reply, countered Belden's arguments. As to claim 1, Berk-Tek argued that JP '910's requirement that each conducting wire fall into its corresponding groove on the core made it imperative to prevent twisting of the core, that there was no reason to doubt board 5's ability to grip the core, and that a skilled artisan would choose an appropriate polymer, and use cooling after extrusion, to avoid friction-caused deformation of the core. As to claim 2, Berk-Tek reiterated the need to prevent twisting and argued that using extra dies to align and alleviate stress in cable manufacturing is routine. As to claim 5, Berk-Tek argued that a skilled artisan, making any cable by joining transmission media with a separator and stranding the group, as in CA '046, would have been motivated to use a die to align the separator and media and prevent back twisting, as taught by JP '910.

The Board agreed with Berk-Tek as to claims 1–4 and with Belden as to claims 5–6. *Berk-Tek, LLC v. Belden Inc.*, IPR2013-57, 2014 WL 1253012 (PTAB Mar. 18, 2014) (Final Written Decision). As to claim 1: The Board concluded that, "by teaching alignment of the grooves and the conductors at board 5, JP '910 suggests using board 5 to prevent twisting motion of core 1. That is, a person of

ordinary skill in the art would have recognized that preventing twisting motion of core 1 in relation to board 5 would maintain alignment between" the grooves and conductors "in accordance with the teaching of JP '910." *Id.* at \*13.  As to claim 2: The Board concluded that US '582 and JP '694 each teach "the benefit of a third die," stating that adding a third die to JP '910 would have "involve[d] merely a predictable use of a prior art element . . . to perform the same function it was known to perform and to yield no more than one of ordinary skill would expect from such use." *Id.* at \*19–20.  As to claim 5: The Board determined that "JP '910 cannot be understood reasonably as teaching or suggesting a method of manufacturing *all* types of twisted cables having a separator," in particular "conventional twisted cable . . . that includes twisted pairs of individually-insulated conductors." *Id.* at \*23 (emphasis added).  The Board faulted Berk-Tek for giving no "apparent reason to combine the known elements of JP '910 and CA '046." *Id.*

The Board also denied Belden's motion to exclude.  It concluded that Mr. Baxter's declaration "fairly respond[ed] to Mr. Clark's declaration" and was unnecessary for Berk-Tek to establish a prima facie case of obviousness. *Id.* at \*26.

Belden appeals the cancellation of claims 1–4 and the denial of its motion to exclude.  Berk-Tek appeals the upholding of claims 5 and 6.  Both appeals are authorized by 35 U.S.C. § 319.  We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

We begin with a review of the substantive challenges to the Board's determinations on the evidence and arguments presented to and considered by it.  We then review Belden's procedural challenge to the Board's decision to allow Berk-Tek's Reply evidence.

A

Whether a claimed invention would have been obvious is a question of law, based on factual determinations regarding the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, the motivations to modify or combine prior art, and any objective indicia of non-obviousness. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). We review the Board's compliance with the governing legal standards de novo and its underlying factual determinations for substantial evidence. *Id.*

1

In challenging the cancellation of claim 1 for obviousness, Belden argues that JP '910 does not teach making cables, but only transmission lines (a component of a cable), and it disputes the Board's finding of a motivation to use board 5 in JP '910 to prevent the twisting of core 1. *See* '503 patent, col. 1, lines 4–8. Neither argument has merit.

The Board found that "[t]he purpose of the invention of JP '910 'is to provide a method of manufacturing plastic insulated communication cable.'" *Berk-Tek*, 2014 WL 1253012, at *11 (quoting JP '910 at ¶ 3); *see Nexans*, 2013 WL 8595538, at *12 ("JP '910 discloses an assembly for manufacturing insulated communication cables."). That finding is supported by substantial evidence. The title of JP '910 is: "A method of manufacturing plastic insulated communication cables." JP '910 at ¶ 1. JP '910 claims "[a] method of manufacturing plastic insulated cables." *Id.* at ¶ 2. The patent further explains: "The present invention relates to a method of manufacturing plastic insulated communication cables." *Id.* at ¶ 3. Belden argues that, despite those descriptions, JP '910 teaches only the making of quads, which themselves are not cables but mere components of cables. But the claims of the '503 patent do not so limit the meaning of "cable" to a

category that excludes quads, and Belden does not dispute that it never argued for a construction of "cable" before the Board. Thus, Belden's argument that JP '910 does not describe a method of making communication cables fails.

The Board also found that, by teaching the need for alignment of the conductors and core at board 5, JP '910 suggested using board 5 to prevent the twisting of core 1. Although the Board twice stated that "board 5 *could* have been used to prevent twisting of core 1 by one with ordinary skill in the art exercising ordinary creativity," *Berk-Tek*, 2014 WL 1253012, at *13, *17 (emphasis added), it did not stop there—and properly so, because obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention. *See InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014). The Board found that "[v]iewed as a whole, JP '910 does teach the importance of avoiding any misplacement of the conductors in relation to the core," *Berk-Tek*, 2014 WL 1253012, at *14; "[a] person with ordinary skill in the art would have recognized that such alignment of the grooves on core 1 with the fixed positions of the conductors on board 5 cannot be maintained if core 1 twists in relation to board 5," *id.* at *13; and "[t]herefore, by teaching alignment of the grooves and the conductors at board 5, JP '910 suggests using board 5 to prevent twisting motion of core 1," *id.* And the Board reiterated its earlier finding in its Institution Decision: "'Given that JP '910 articulates a special need to have the wires aligned at precise locations on the core during stranding after passing through wire-splitting board 5, one with ordinary skill in the art would have known that the passage of core 1 through wire-splitting board 5 *preferably should* be made such that twisting of the core causing misalignment of the wires would be prevented.'" *Id.* at *14 (emphasis added). In support of those affirmative findings, the Board re-

peatedly cited the Petition.  *Id.* at *13, *14, *15 (relying on J.A. 146–47).

Those findings suffice to show that claim 1 (and claim 4) must fall, because the findings are supported by substantial evidence.  In the circumstances here, involving a simple point in a mechanical field and one very close piece of prior art, the Board was entitled to rely on its own reading of JP '910—supported by the Petition's observations about it—to find that a skilled artisan would have understood the importance of aligning the core and conductors and the connection between achieving such alignment and preventing the core from twisting at the aligning die.  And the Board also had substantial evidence on which to reject Belden's contrary arguments.

Mr. Baxter responded to Belden's suggestion that a skilled artisan would have had no reason to modify board 5 of JP '910 to prevent twisting, as required by claim 1 of Belden's patent.  He stated that JP '910 and Belden's patent address the same problem of aligning conductors with grooves in a cable's core; that JP '910's touted elimination of "back-stranding" of wires—imparting a preparatory twist to the wires before cable manufacturing to compensate for twisting during cabling, JP '910 at ¶ 3— made it evident that twisting should be prevented by another means; and that a skilled artisan would have seen that the die (board 5 in JP '910) should be used to control twisting.  Mr. Baxter also plausibly explained why the S-Z stranding in JP '910 might increase the need to prevent twisting at the die, contrary to Belden's suggestions that the alternating-direction stranding would by itself so clearly prevent misalignment of the core with the conducting wires that there was no reason to contemplate using board 5 to prevent twisting.  And in answer to Belden's argument about friction-caused deformation of the core if the die hugged the core to prevent its twisting, Mr. Baxter stated that a skilled artisan would have chosen a polymer with the right resistance to heat and a

cooling process after extrusion. The Board thus had an ample basis for its obviousness determination as to claims 1 and 4.

2

As to claims 2 and 3, Belden does not dispute that both US '582 and JP '694 disclose a third die. *See* US '582 Fig. 1; *id.* Fig. 3; *id.*, col. 5, lines 20–33; JP '694 Fig. 2; *id.*, col. 4, lines 7–12. Belden disputes only the Board's finding of a reason to combine a third die with the method of JP '910.

The Board found that "die 71 in [US '582] and die 31 in JP '694 each suggests passing the transmission media and the core through a third die that generally centers the core relative to the plurality of transmission media," *Berk-Tek*, 2014 WL 1253012 at *18, and that each patent "teaches the benefit of a third die," *id.* at *19. It also found that "a person of ordinary skill in the art would have added a third die, as recited in claim 2, in order to align further the cable components." *Id.* The Board cited the Petition's argument to that effect. *Id.* at *18, *19 (citing J.A. 154).

Significantly, it was only in the context of those findings about why a skilled artisan *would have* had reason to add a third die that the Board quoted the Supreme Court's reference to a "predictable variation" in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). *Berk-Tek*, 2014 WL 1253012 at *19. The Supreme Court's passage does not establish that it suffices for obviousness that a variation of the prior art would predictably work, but requires consideration of whether, in light of factors such as "design incentives and other market forces," the hypothetical skilled artisan would recognize the potential benefits and pursue the variation. *KSR*, 550 U.S. at 417. In the present case, the Board, in its overall analysis, made the required full inquiry.

The Board's findings suffice to show that claim 2 (and claim 3) must fall, because the findings are supported by substantial evidence. Here, as with claim 1, the prior art is close enough and plain enough that, with even an abbreviated argument in the Petition, the Board could determine that a skilled artisan would see the benefit of adding a third die to enhance alignment. And here, as with claim 1, the Board had sufficient evidence to reject Belden's arguments to the contrary.

In response to Belden's argument that a skilled artisan would have no reason to add a third die to JP '910, though one is undisputedly shown in US '582 and JP '694, Mr. Baxter explained that a third die upstream from the first die would have a "benefit" of "'more accurately aligning the input wires with the rest of the machine with less or lessened tensions and with better angles, allowing the supply reels to be located farther from the wire-splitting board.'" *Berk-Tek*, 2014 WL 1253012, at *19 (quoting J.A. 706). Mr. Baxter also responded to Belden's argument that a third die would increase friction and drag, harming a fragile core. He stated that fragility was speculative and that an upstream die would be "'looser fitting.'" *Id.* (quoting J.A. 706). Berk-Tek, citing the Baxter declaration, argued in its Reply that a third die was a "'routine'" way of improving alignments and lessening tensions. *Id.* (quoting J.A. 897). The Board thus had an ample basis for its obviousness determination as to claims 2 and 3.

3

As to claims 5 and 6, Berk-Tek argues that a person of ordinary skill in the art seeking to manufacture cables disclosed in CA '046—with four insulated twisted pairs and a separator—would have been motivated to use the method of JP '910 to solve the alignment issues common to manufacturing the cables in both prior-art sources. Even giving the Board the deference it is due under the

substantial-evidence standard of review of factual findings, we agree that the record requires the finding Berk-Tek urges. The Board's contrary finding rests on legal errors.

There is no meaningful dispute here, and the Board did not deny, that the two pieces of prior art in combination teach or suggest the methods of claims 5 and 6. The dispute concerns motivation to combine. The Petition and the Institution Decision reveal the two related ways in which that issue was presented and considered: whether a skilled artisan would substitute the twisted pairs of CA '046 into the method of JP '910; alternatively, whether a skilled artisan making the cable of CA '046 would look to the JP '910 method to make it. The brief discussion in the Petition suggests both views of the matter. J.A. 148–49 ("CA '046 . . . in view of . . . JP '910 . . . invalidates claims 3 through 5"); J.A. 155 ("JP '910 uses single conductors (4a-4d), but it is known to likewise use twisted pairs with a cross shaped separator—see for example CA '046"). The Board's Institution Decision does so as well: "[O]ne with ordinary skill in the art would have understood that the method of JP '910 is applicable for use in manufacturing a telecommunications cable. Accordingly, one with ordinary skill in the art would have known to apply the teaching in CA '046, about a conductor unit's being made conventionally of a twisted pair of conductors, to each conductor unit 4a, 4b, 4c, and 4d, in JP '910." *Nexans*, 2013 WL 8595538, at *18.

As the Board found, it is "undisputed that CA '046 discloses 'a helically twisted cable.'" *Berk-Tek*, 2014 WL 1253012, at *24. There is no dispute that the twisted pairs in CA '046 need to fit into the notches of (*i.e.*, be aligned with) the separator, as shown in the two figures from CA '046 reproduced above, for the resulting cable to be made. And the Board correctly recognized in its discussion of claims 1 and 2 that JP '910 clearly teaches the importance of aligning conductors with a separator (core),

and suggests doing so with a die to prevent twisting of the separator, before they are all bunched together for twisting in a stranding device. That evidence points clearly toward a motivation of a skilled artisan to arrive at the methods of claims 5 and 6 based on JP '910 and CA '046, as the Board reasoned in its preliminary determination in the Institution Decision.

None of the Board's reasons for concluding otherwise in its Final Written Decision withstands scrutiny through the lens of governing law. The Board's first reason was that JP '910 shows only conductors that are not individually insulated, so that "one of ordinary skill, tasked to produce the conventional twisted cable of CA '046, would *not* have been motivated by the teachings of JP '910 simply to substitute twisted pairs of insulated conductors for the bare metal conductors in the method of JP '910." *Berk-Tek*, 2014 WL 1253012, at *23 (emphasis in original). But JP '910 plainly discloses the need to align the conducting wires with the core and how to do so, as the Board recognized in its analysis of claims 1 and 4, *id.* at *13–14. The alignment problem and solution do not depend on whether the wires are insulated. The Board's disregard of the insulation-independent alignment teaching of JP '910 violates the principle that "[a] reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) (emphases in original); *see In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012).

The Board next reasoned that "Berk-Tek ha[d] not explained why a person of ordinary skill in the art would have had sufficient reason to use the S-Z stranding step of JP '910 to manufacture the helically-twisted cable of CA '046," stating that "the S-Z stranding step of JP '910 is inconsistent with production of a helically-twisted cable." *Berk-Tek*, 2014 WL 1253012, at *24. That reasoning

makes the same mistake we have just noted regarding the Board's reliance on the lack of insulation of the individual conductors in JP '910: it disregards the evident independent force of JP '910's teaching of the alignment problem and solution. The Board did not find, and could not reasonably find, that the significance to claims 5 and 6 of JP '910's alignment teaching is dependent on the particular method of stranding described in JP '910, any more than it is dependent on insulation of individual wires. The claims of Belden's patent call simply for "twisting" the assembly, without restrictions on the particular kind of twisting. And Belden's expert, Mr. Clark, did not rely on the S-Z stranding method of JP '910 in urging the validity of claims 5 and 6.

The Board, returning to its focus on insulation of individual conductors, further reasoned: "Berk-Tek also has not explained why a person of ordinary skill in the art would have had sufficient reason to use the final jacketing/extrusion step of JP '910, which serves to insulate electrically the bare-metal conductors of JP '910, to manufacture a cable comprising twisted pairs of individually-insulated conductors that do not require additional electrical insulation." *Id.* The Board found no answer to Belden's statement that the final jacketing step, if the conductors themselves were insulated, would be "'redundant.'" *Id.* But that logic misconstrues the claim language and overlooks on-point evidence.

The claim language concerning the final jacketing step does not require that the jacket be insulating at all. And it is clear from the Belden patent and at least CA '046 that the jacketing step serves a function not dependent on adding insulation. The evident function is to hold the assembly together to form a cable, and hold its components in place, whether or not the component conductors are insulated. Thus, Belden's patent itself declares that "*[c]onventional* designs of data grade telecommunications cables for installation in plenum cham-

bers have a low smoke generating *jacket* material . . . surrounding a core of twisted conductor pairs, *each conductor individually insulated* with a[n] . . . insulation layer." '503 patent, col. 2, lines 24–30 (emphases added); *see id.*, col. 4, lines 22–25; *id.*, col. 2, lines 59–64 ("[T]he cable includes . . . an outer jacket maintaining the plurality of data transmission media in position with respect to the core."). CA '046 also teaches this purpose of jacketing insulated twisted pairs. CA '046, col. 3, line 16 to col. 4, line 4 ("[I]n a cable 20, the *jacket 12 surrounds four pairs 14 of insulated conductors* 16 which are held in controlled distances apart, as they extend in stranded condition along the cable, by a spacer means in the form of a central core member 20.") (emphasis added).

Finally, the Board made a passing reference to "Belden's argument that modifying the cable of JP '910 to include twisted pairs would 'destroy the circular shape of JP '910's "quad" wire.'" *Berk-Tek*, 2014 WL 1253012, at *24. But nothing in the '503 patent describes or claims the circularity of the cable produced by its method. And neither JP '910 nor CA '046 ascribes any significance to the shape of the cables they disclose. The Board identified, and we see, no reason that the teaching of JP '910 about the alignment problem and solution is inapplicable to making the cables of CA '046 even if the resulting cable's cross-section is not circular.

In short, the record is one-sided on the proper question of whether JP '910 taught a solution to the problem of aligning cable components that a skilled artisan would have been motivated to use in making CA '046's cables. The Board erred in determining that Berk-Tek had not proven the obviousness of the methods of claims 5 and 6 of the '503 patent by a preponderance of the evidence.

B

Belden challenges the Board's denial of the motion to exclude the Baxter declaration that Berk-Tek submitted

with its Reply.  It argues that the Board violated a regulation governing evidence submitted with a Reply and two aspects of the Patent Office Trial Practice Guide, thereby relying on evidence to which Belden lacked a fair opportunity to respond.  We review the Board's evidentiary ruling for abuse of discretion, which may be found if the Board violated governing law.  *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003).  We reject Belden's contentions.

1

Belden asserts that Berk-Tek's filing of the Baxter declaration violated 37 C.F.R. § 42.23(b), which states that "[a] reply may only respond to arguments raised in the corresponding opposition or patent owner response." The Board found no violation, concluding that Mr. Baxter's declaration "fairly responds to Mr. Clark's declaration" and is "generally . . . in fair reply to Mr. Clark's declaration and/or Belden's response to the revised petition." *Berk-Tek*, 2014 WL 1253012, at *26.  We see no error in that ruling.

Each of the points that Mr. Baxter made in his declaration responds to a statement made in Mr. Clark's declaration.  Mr. Baxter's discussion of claims 1 and 4 of Belden's patent is representative.  After quoting Mr. Clark's argument that JP '910 does not teach a method of making communication cables, the Baxter declaration responds with reference to JP '910 and a supporting exhibit.  J.A. 692.  After summarizing Mr. Clark's argument about JP '910's teaching of a need to control twisting of the core and the elimination of back twisting, the Baxter declaration explains what JP '910 means by "back stranding" and distinguishes back stranding from the problem of "back-twisting" addressed by Belden's patent and JP '910.  J.A. 692–97.  The Baxter declaration then similarly summarizes and responds to Mr. Clark's statements regarding S-Z stranding in JP '910, the utility of

board 5 in preventing twisting of the core, the deformability of the core in JP '910, and the ability of board 5 to grip the core. J.A. 697–705. The Baxter declaration's discussion of claims 2, 3, 5, and 6 follows a similar approach. J.A. 706–09. The Board did not abuse its discretion in concluding that, as relevant here, Mr. Baxter's declaration fairly responds only to arguments made in Mr. Clark's declaration and Belden's response.

2

Belden relies on a passage from the Patent Office Trial Practice Guide that elaborates on the regulation that limits replies to responsive arguments, excluding new issues. The passage states that "[e]xamples of indications that a new issue has been raised in a reply include new evidence necessary to make out a prima facie case for the . . . unpatentability of an original . . . claim." 77 Fed. Reg. at 48,767. Belden argues that the Baxter declaration, submitted with Berk-Tek's Reply, was necessary to make out the prima facie case of obviousness and for that reason should have been excluded.

Although the Board has recognized that the Guide merely "provides guidance," *Innolux Corp. v. Semiconductor Energy Lab. Co.*, IPR2013-60, 2013 WL 8595541, at \*3 (PTAB May 3, 2013), the Board did not reject Belden's contention on the ground that the Guide is not a binding regulation. Rather, the Board rejected Belden's premise "that Mr. Baxter's testimony was necessary for Berk-Tek to establish a prima facie case." *Berk-Tek*, 2014 WL 1253012, at \*26. We see no error in that ruling.[4]

---

[4] The same Guide passage includes, among its "[e]xamples of indications that a new issue has been raised in a reply," "new evidence that could have been presented in a prior filing." 77 Fed. Reg. at 48,767. That

Our earlier discussion of the merits of the obviousness issues shows how the prior art itself, together with the Petition, sufficed to supply a prima facie case of obviousness—as confirmed by the Institution Decision.   For example, as to claim 1, the Board found that JP '910 itself articulates a special need to have the wires aligned with the grooves on the core after passing through board 5, and that one with ordinary skill in the art would have known that board 5 could and preferably should be made to prevent twisting of the core that would cause misalignment.   *Berk-Tek*, 2014 WL 1253012, at *14–15; *Nexans*, 2013 WL 8595538, at *14.  As to claim 2, the Board found that both US '582 and JP '694 disclose the advantage of using an additional die to center the core relative to the transmission media, and that a person of skill in the art would recognize that the same benefit predictably would be achieved by using a third die in the method of JP '910. *Berk-Tek*, 2014 WL 1253012, at *18–19; *Nexans*, 2013 WL 8595538, at *15.  Such findings are well supported in the prior-art documents themselves, as are those which we have concluded show obviousness of the methods of claims 5 and 6.

To be sure, the Board cited Mr. Baxter's declaration in its Final Written Decision—mostly in explaining why it was rejecting Belden's arguments, but partly in stating the affirmative reasons to find the motivation required for a prima facie case.  But such citations do not mean that the Baxter declaration was "necessary" for the prima facie case.   Evidence admitted in rebuttal to respond to the patent owner's criticisms will commonly confirm the prima facie case.  That does not make it necessary to the prima facie case.  And nothing required the Board to write

language—which, read literally, might cover most responsive evidence—is not independently significant here.

its opinion to separate the material offered by Berk-Tek at different stages of the proceeding.

No rule requires a Petition to be accompanied by any declaration, let alone one from an expert guiding the Board as to how it should read prior art. What the Board can find without an expert depends on the prior art involved in a particular case. Even in court, we have said, "expert testimony is not required when the references and the invention are easily understandable." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1242 (Fed. Cir. 2010). And Board members, because of expertise, may more often find it easier to understand and soundly explain the teachings and suggestions of prior art without expert assistance. In the present case, which is all we address, we conclude that the Baxter declaration was not necessary for the prima facie case of obviousness.

3

Belden cites the Patent Trial Guide's statement that "[t]he Board will not attempt to sort proper from improper portions of the reply." 77 Fed. Reg. at 48,767. It argues on that basis that the Board had to exclude Berk-Tek's entire Reply and supporting material if any portion was improper. But Belden has identified no part of the Reply and supporting declaration that is improper and material to the Board's ruling. Nothing in the Guide requires wholesale exclusion in such circumstances. More generally, the Guide cannot fairly be read to do more than put the public on notice that the Board may, in its discretion, refuse to consider a Reply if any part is improper. Here, the Board warned Berk-Tek and gave it an opportunity to truncate its Reply and supporting submissions to eliminate any improper material. We see no error in that reasonable course of action.

4

Belden's broadest contention is that the Board improperly relied on new evidence to which Belden had no opportunity to respond. But Belden provides no argument on this score that is independent of its specific allegations of error. We have rejected those allegations, upholding the Board's rulings that the Baxter evidence was legitimately responsive to Belden's arguments and not needed for a prima facie case of obviousness. In these circumstances, and without any other identification of error, Belden has not established that it was denied its procedural rights.

A patent owner in Belden's position is undoubtedly entitled to notice of and a fair opportunity to meet the grounds of rejection. "The indispensable ingredients of due process are notice and an opportunity to be heard by a disinterested decision-maker." *Abbott Labs. v. Cordis Corp.*, 710 F.3d 1318, 1328 (Fed. Cir. 2013). And for a formal adjudication like the one at issue here, the Administrative Procedure Act requires the PTO to "timely inform[]" a patent owner of "the matters of fact and law asserted" in an inter partes review of its patent, 5 U.S.C. § 554(b)(3), to give "all interested parties opportunity for . . . the submission and consideration of facts [and] arguments . . . [and] hearing and decision on notice," § 554(c), and to permit a party "to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts," § 556(d). *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990). Section 554(b)(3) has been applied to mean that "an agency may not change theories in midstream without giving respondents reasonable notice of the change" and "the opportunity to present argument under the new theory." *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256–57 (D.C. Cir. 1968). In a related PTO setting, this court has determined whether

the Board relied on a "new ground of rejection" by asking "whether applicants have had fair opportunity to react to the thrust of the rejection." *In re Biedermann*, 733 F.3d 329, 337 (Fed. Cir. 2013) (internal quotation marks and citation omitted).

But the rules and practices of the Board generally protect against loss of patent rights without the required notice and opportunity to respond. If there are deficiencies in Board rules and practices, none has been established as relevant to this case. Nor has Belden identified a deficiency in the application of Board rules and practices to this case.

The statute provides for inter partes review proceedings to begin with a petition from the challenger. 35 U.S.C. §§ 311, 312(a). The patent owner has the right to file a preliminary response to argue against the institution of review. § 313. If a review is instituted, based on a finding of a reasonable likelihood that the claims do not meet statutory requirements, the patent owner has the right to file a post-institution response to defend the claims. § 316(a)(8). The petitioner also has a right to file at least one set of written comments. § 316(a)(13). And both parties have a right to an oral hearing. § 316(a)(10).

The PTO Director has implemented those provisions through regulations under § 316(a). The regulations provide for the two patent-owner filings, one before and one after institution. 37 C.F.R. §§ 42.107(a), 42.120(a). And they allow the petitioner to reply to the patent owner's post-institution response, but declare that the "reply may only respond to arguments raised in the corresponding opposition or patent owner response." § 42.23(b).

Under § 42.51(b)(1)(ii), moreover, a party may cross-examine an affiant who has submitted testimony prepared for the review. Under § 42.51(b)(2)(i), a party also may move for additional discovery. In addition, a party may move to exclude evidence, whether as improper

under the response-only regulation, under the Trial Practice Guide's advice, or on other grounds. § 42.64(c). The Guide itself provides that, "[i]n the event that cross-examination occurs after a party has filed its last substantive paper on an issue, . . . [t]he Board may authorize the filing of observations" on that cross-examination, though the observations are to be brief and non-argumentative. 77 Fed. Reg. at 48,767–68. And for most regulations governing inter partes review—*i.e.*, those promulgated under parts 1, 41, and 42 of title 37 of the Code of Federal Regulations—"[t]he Board may waive or suspend a requirement . . . and may place conditions on the waiver or suspension." 37 C.F.R. § 42.5(b).

Finally, although no rule provides patent owners the right to file surreplies to a petitioner's Reply, the Board has allowed such surreplies in inter partes reviews. *See, e.g.*, *Sensio, Inc. v. Select Brands, Inc.*, IPR2013-580, 2015 WL 1009189, at *1, *4–7 (PTAB Feb. 9, 2015); *Zodiac Pool Sys., Inc. v. Aqua Prods., Inc.*, IPR2013-159, 2014 WL 4244016, at *1, *22 (PTAB Aug. 22, 2014); *ABB, Inc. v. ROY-G-BIV Corp.*, IPR2013-63, 2014 WL 2112556, at *4 (PTAB May 16, 2014). In doing so, the Board has followed a tradition that pre-dates the America Invents Act. In proceedings on applications and in interferences, the Board (or its predecessor) has long granted permission to file surreplies despite the absence of any regulation providing for such filings.[5]

---

[5] For interferences, see, *e.g.*, *Tseng v. Doroodian*, Interference No. 104,482, 2002 WL 390537 at *28 (BPAI 2002); *Flanders v. Moorman*, Interference No. 103,891, 2001 WL 35825814, at *2–4 (BPAI Sept. 26, 2001). For applications, see, *e.g.*, *Ex parte Jang*, Appeal No. 2011-7826, 2012 WL 3186809, at *4 (BPAI July 31, 2012); *Ex parte Wyss*, Appeal No. 2011-5375, 2012 WL 3142233, at

Thus, if the petitioner submits a new expert declaration with its Reply, the patent owner can respond in multiple ways. It can cross-examine the expert and move to file observations on the cross-examination. It can move to exclude the declaration. It can dispute the substance of the declaration at oral hearing before the Board. It can move for permission to submit a surreply responding to the declaration's contents. And it can request that the Board waive or suspend a regulation that the patent owner believes impairs its opportunity to respond to the declaration. The options are not mutually exclusive.

In the foregoing respects, the Board's rules and practices establish standards bearing similarities to those often applied in district-court litigation. *See* Victor Gold, 28 Fed. Prac. & Proc. Evid. § 6164 (2d ed. 2015). The tribunal has broad discretion to regulate the presentation of evidence under Fed. R. Evid. 611(a). Rebuttal evidence is supposed to be limited to that which is responsive to the adversary's evidence: "the traditional principle [is] that evidence offered to rebut must accomplish the function of rebuttal; 'to explain, repel, counteract, or disprove

---

*1 n.1, *3 (BPAI July 31, 2012); *Ex parte Zajchowski*, Appeal No. 2010-6962, 2012 WL 2992507, at *2 (BPAI July 13, 2012); *Ex parte Selvin*, Appeal No. 2009-13065, 2010 WL 2070576, at *2 n.8, *3 (BPAI May 21, 2010); *Ex parte Domb*, Appeal No. 2008-3664, 2010 WL 2030469, at *8–10, *12 (BPAI May 20, 2010); *Ex parte Frippiat*, Appeal No. 2009-10881, 2010 WL 1725736, at *2, *5 (BPAI Apr. 26, 2010); *Ex parte Kringelum*, Appeal No. 2008-3378, 2008 WL 3272056, at *7 (BPAI Aug. 7, 2008); *Ex parte Schultz*, Appeal No. 2008-3731, 2008 WL 2856377, at *6, *9–10 (BPAI July 24, 2008); *Ex parte Wells*, Appeal No. 2005-2607, 2005 WL 4779434, at *1 n.2 (BPAI Sept. 23, 2005); *Ex parte Yoshida*, Appeal No. 1997-61, 1999 WL 33134885, at *1 (BPAI Oct. 18, 1999).

the evidence of the adverse party.'" Gold, *supra* (quoting *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980)). Where new enough matter is allowed on rebuttal, surrebuttal may be allowed, but a proffer of specifics may be required to justify the additional round of evidentiary submissions. Gold, *supra*; *Hall v. General Motors Corp.*, 647 F.2d 175, 181 (D.C. Cir. 1980); *United States v. Sadler*, 488 F.2d 434, 435 (5th Cir. 1974). Those standards are widely employed to provide the required procedural fairness through careful case-specific application.

Here, the Board held Berk-Tek to the response-only standard for evidence submitted with a Reply and even held itself to ensuring that the prima facie case did not depend on that evidence. It provided for Belden's cross-examination of Mr. Baxter and for submission of non-argumentative observations on that cross-examination. It accepted Belden's detailed motion to exclude (and its reply after Berk-Tek's response). It provided Belden with a meaningful opportunity to respond to the propriety of Mr. Baxter's evidence submitted with Berk-Tek's Reply, in that it granted every request Belden made for consideration of the issue. Belden did not seek to file a surreply, to file additional observations on its cross-examination, to make arguments in those observations, or to have the Board waive any other regulations that it believed prevented it from adequately responding to Mr. Baxter's declaration. With no Board denial of concrete, focused requests before us, we are not prepared to find that Belden was denied a meaningful opportunity to respond to the grounds of rejection, and we find no basis for disturbing the Board's denial of Belden's motion to exclude.

CONCLUSION

For the foregoing reasons, we affirm the Board's determinations that claims 1–4 of the '503 patent would have been obvious, reverse the Board's determination that

claims 5 and 6 would not have been obvious, and affirm the Board's denial of Belden's motion to exclude.

No costs.

**AFFIRMED IN PART AND REVERSED IN PART**